| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF INDIANA, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) CAUSE NO.: 2:17-CV-478-TLS ) |
| DON J. WAGONER, MARILYN L. WAGONER, WAGONER MEDICAL CENTER, L.L.C., WAGONER MEDICAL CENTER, P.C., and DON J. WAGONER, M.D. AND MARILYN L. WAGONER, M.D., P.C., | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## OPINION AND ORDER

On December 29, 2017, Plaintiffs United States of America and the State of Indiana (together, "Plaintiffs") filed their Complaint [ECF No. 1 (Compl.)] against Defendants Don J. Wagoner, Marilyn L. Wagoner, Wagoner Medical Center, L.L.C., Wagoner Medical Center, P.C., and Don J. Wagoner, M.D. and Marilyn L. Wagoner, M.D., P.C. (together, "Defendants"). The Complaint alleges that the Defendants induced overpayments from the Indiana Medicaid Program by their false and fraudulent billings for medical services. The Complaint asserts claims for violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., and the Indiana Medicaid False Claims and Whistleblower Protection Act ("Indiana FCA"), Ind. Code § 5-11-5.7 et seq., as well as other statutory and common law claims.

On January 22, 2018, the Defendants filed a motion to dismiss [ECF No. 9], seeking dismissal of the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). Also on January 22, 2018, Defendants Marilyn L. Wagoner, Wagoner Medical Center, P.C., and Don

J. Wagoner, M.D. and Marilyn L. Wagoner, M.D., P.C. filed a motion to dismiss [ECF No. 11] seeking dismissal of the claims against them pursuant to Rule 12(b)(6). The Plaintiffs filed a combined opposition brief [ECF No. 17 (Pls. Resp.)] in response to both motions to dismiss. The Defendants filed two separate reply briefs to the motions to dismiss [ECF Nos. 18, 19]. The motions are now briefed and ripe for review.

## BACKGROUND

The Court draws the following facts from the Complaint. *See Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009) (stating that "for purposes of the motion to dismiss we accept all factual allegations in the complaint and draw all reasonable inferences from those facts" in favor of the plaintiff).

The United States of America brought this action on behalf of itself and the United States Department of Health and Human Services, which oversees the Medicaid Program. (Compl., ¶ 5.) Funding for Medicaid is shared between the federal government and those states, including Indiana, participating in the Medicaid Program. (*Id*.) The State of Indiana brought this action on behalf of itself and the Office of Medicaid Policy and Planning, which administers the Indiana Health Coverage Program ("IHCP" or "Indiana Medicaid"). (*Id*., ¶ 6.) Don J. Wagoner ("Don Wagoner") is the owner of Wagoner Medical Center, L.L.C. ("WMC"), Wagoner Medical Center, P.C. ("Wagoner PC"), and Don J. Wagoner, M.D. and Marilyn L. Wagoner, M.D., P.C. ("Wagoner & Wagoner") (together, "Entity Defendants").[1]  (*Id*., ¶ 7.) Marilyn L. Wagoner ("Marilyn") is the spouse of Don Wagoner, the co-owner of Wagoner & Wagoner, and an

---

[1] WMC and Wagoner PC were organized as medical facilities by Don Wagoner. (Compl., ¶¶ 9, 10.) Wagoner & Wagoner was organized as an Indiana Medical Professional Corporation by Marilyn and Don Wagoner. (*Id*., ¶ 11.)

executive of Wagoner PC. (*Id.*, ¶ 8.) Marilyn and Don Wagoner practiced medicine through the Entity Defendants. (*Id.*, ¶¶ 7, 8.) The Defendants were in the business of providing medical services to Medicaid recipients and receiving payment for these medical services from Indiana Medicaid. (*Id.*, ¶ 39.)

WMC was enrolled as a Medicaid provider and authorized biller with the Indiana Medicaid Program. (*Id.*, ¶¶ 9, 38.) Under Indiana Code § 12-15-11-2, medical providers who wish to provide services to Medicaid patients must execute a Provider Agreement. (*Id.*, ¶ 35.) Under the Provider Agreement, a provider, together with its authorized agents, employees, and contractors, are required to comply with all federal and State of Indiana statutes and regulations pertaining to Medicaid, the IHCP Provider Manual, and all bulletins and notices communicated to the provider. (*Id.*, ¶ 36.) Pursuant to the Provider Agreement and the rules of the IHCP program, compliance with the Provider Agreement, IHCP Provider Manual, program bulletins, and notices are a condition of payment. (*Id.*, ¶ 40.) Don Wagoner and WMC executed, and were obligated to comply with, IHCP Provider Agreements. (*Id.*, ¶ 37.)

The Defendants had a routine practice of requiring patients seeking a prescription for opioid pills or other pain medicine to submit a urine sample for qualitative testing for the presence or absence of nine or more drugs and drug classes. (*Id.*, ¶ 53.) One type of qualitative urine drug test kit, known as a multiplexed screening kit, is designed to use a single urine sample to test for multiple drugs or drug classes of abused drugs in the patient's system. (*Id.*, ¶ 46.) In contrast, quantitative testing determines the quantity of the particular drug or drug class in the urine sample, often using chromatographic equipment. (*Id.*, ¶¶ 43-44.) The Defendants never possessed or used chromatography equipment to analyze urine samples. (*Id.*, ¶ 44.)

Health care providers enrolled in Indiana Medicaid submit claims to the program for reimbursement electronically using a set of codes that identify the services performed for covered individuals. (*Id.*, ¶ 41.) The codes for medical services and procedures are written by the American Medical Association ("AMA") and published annually in books entitled Current Procedure Terminology, Professional Edition ("CPT"). (*Id.*) The abbreviation CPT is used within the healthcare field to both refer to the published CPT book and the individual five digit codes contained within the book. (*Id.*) In December 2010, all enrolled Indiana Medicaid providers, including the Defendants, received IHCP Bulletin BT201062 announcing a new CPT Code 80104, "drug screen, qualitative; multiple drug classes other than chromatographic procedure." (*Id.*, ¶ 51.) The 2011 CPT book explained, beneath the language for CPT Code 80101, "[f]or qualitative analysis by multiplexed screening kit for multiple drugs or drug classes, use 80104." (*Id.*) The effective date for the new billing rules requiring Indiana Medicaid providers to use CPT code 80104 was January 1, 2011. (*Id.*, ¶ 54.)

Indiana Medicaid rules allow an enrolled provider to add an additional code, the "91 modifier," to a CPT code to indicate that subsequent identical services were rendered to the same patient on the same day for legitimate treatment purposes. (*Id.*, ¶ 49.) For example, when submitting a claim for payment using the 91 modifier, the enrolled provider certifies that the same patient returned to the office later the same day and provided a new urine sample, and the enrolled provider analyzed the additional urine sample for drugs or drug classes. (*Id.*) The 91 modifier is not appropriate for testing using a single urine sample when the patient only comes in once during a particular day, even if the urine sample is used for qualitative analysis of multiple drugs or drug classes using a multiplexed screening kit. (*Id.*, ¶ 50.) In March 2009, all enrolled Indiana Medicaid providers, including Don Wagoner and WMC, received IHCP Bulletin

BT200907, which explained the 91 modifier billing rules. (*Id*.) They also received reminders of the 91 modifier billing rules in IHCP bulletins in February 2011 and June 2011. (*Id*.) Additional AMA sources were available to the Defendants with explanations of the 91 modifier billing rules. (*Id*.)

From January 1, 2011, through January 13, 2013, Don Wagoner and WMC performed all of its urine drug screen tests qualitatively using a single urine sample on a multiplexed screening kit. (*Id*., ¶ 51.) The coding rules required WMC to bill CPT Code 80104 only once, without any modifier, for each patient each day the patient provided a single urine sample that was qualitatively analyzed using a multiplexed screening kit. (*Id*.) In January 2011, the Defendants continued to use CPT Code 80101 at least nine times when billing Indiana Medicaid for testing a single urine sample from a single patient on a single day using a multiplexed screening kit. (*Id*., ¶ 55.) In or around January 2011, Indiana Medicaid routinely denied all but one claim of the Defendants' urine drug test claims using CPT code 80101 each time the Defendants billed CPT Code 80101 more than one time for the same patient on the same day. (*Id*., ¶ 56.) WMC's billing manager, Sandy Thompson ("Thompson"), told Don Wagoner about the Indiana Medicaid claims denials. (*Id*., ¶ 57.) At Don Wagoner's direction, Thompson contacted Indiana Medicaid to ask why the claims were denied. (*Id*., ¶¶ 57, 58.) Thompson told Don Wagoner that Indiana Medicaid denied the claims based on new billing rules requiring providers to bill urine drug screen test for the same patient on the same day only once. (*Id*., ¶ 58.)

After learning of the reason for the claims denials, the Defendants allegedly devised a scheme to be paid nine or more times for each drug screen test using a single urine sample from a single patient on a single day with a multiplexed screening kit. (*Id*., ¶ 59.) WMC's billing department employees typed in Indiana Medicaid claims based on the notations on the superbill

provided to them by physicians and physician's assistants, including Marilyn, at WMC. (*Id*.) At Don Wagoner's direction, WMC's office manager Michelle Wagoner programmed the billing department's computer so that it would automatically populate nine claims for CPT Code 80101, with a 91 modifier after each claim, each time a billing employee typed CPT Code 80101 once. (*Id*.) Thereafter, at Don Wagoner's direction, WMC's billing staff routinely billed CPT Code 80101 with a 91 modifier at least nine times every time WMC tested a single urine sample for a single patient visit on a single day using a multiplexed screening kit. (*Id*.) By routinely using the 91 modifier in this fashion, the Defendants were falsely certifying to Indiana Medicaid that each of the patients had come into WMC's office at least nine times on a single day and provided nine separate urine samples that WMC's laboratory had then separately tested. (*Id*.)

WMC's policy regarding urine drug screen tests was a frequent topic of conversation at monthly staff meetings attended by Thompson, WMC's office manager, billing department employees, and occasionally, Don Wagoner. (*Id*., ¶ 60.) During periodic meetings of physicians and physician's assistants at WMC, revenue generated from insurance billings, including Indiana Medicaid, for urine drug screen tests was discussed at least once. (*Id*., ¶ 61.) Marilyn and Don Wagoner routinely attended those meetings. (*Id*.) After Thompson discerned that the Defendants continued to bill Indiana Medicaid nine or more times for a single urine sample for the same patient on the same day, she spoke with Don Wagoner and recommended that the Defendants repay Indiana Medicaid. (*Id*., ¶ 62.) Don Wagoner refused and told Thompson that the Defendants would not issue any refunds to Indiana Medicaid. (*Id*.)

The Defendants' allegedly false and fraudulent claims to Indiana Medicaid were for services rendered between January 1, 2011, and January 13, 2013, and resulted in approximately 6,433 claims that induced Indiana Medicaid to overpay the Defendants approximately $1.1

million. (*Id.*, ¶ 63, Exs. 1A-1E.).) These claims were allegedly presented, or caused to be presented, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false. (*Id.*, ¶¶ 68, 74, 103, 109.) Among other false records or statements, the Defendants allegedly: (1) drafted superbills and other documents instructing WMC's employees to make entries into the Defendants' computer that caused the submission of false claims to Indiana Medicaid; and (2) for each patient, used or caused to be used nine or more claims for a single urine drug test using a multiplexed screening kit, thereby falsely certifying that they separately analyzed nine or more urine samples for each patient. (*Id.*, ¶¶ 72, 107.) The Complaint asserts twelve claims against the Defendants for: violations of the FCA, 31 U.S.C. §§ 3729(a)(1)(A), (B), (G); conspiracy to violate the FCA, 31 U.S.C. § 3729(a)(1)(C); payment by mistake; unjust enrichment; violations of the Indiana FCA, Ind. Code §§ 5-11-5.7-2(a)(1), (2), (6); conspiracy to violate the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(7); improper receipt of Medicaid payments, Ind. Code § 12-15-23-8; and relief under the Indiana Crime Victims Relief Act, Ind. Code §34-24-3-1.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint and not the merits of the suit. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). The court presumes all well-pleaded allegations to be true, views them in the light most favorable to the plaintiff, and accepts as true all reasonable inferences to be drawn from the allegations. *Whirlpool Fin. Corp. v. GN Holdings*, *Inc.*, 67 F.3d 605, 608 (7th Cir. 1995). A complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Additionally, when pleading fraud, the federal rules set a higher bar. Federal Rule of Civil Procedure 9(b) states that in fraud cases, "a party must state with particularity the circumstances constituting fraud. . . ." The Seventh Circuit has stated that Rule 9(b) "effectively carves out an exception to the otherwise generally liberal pleading requirements under the Federal Rules." *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chi.*, 927 F.2d 988, 992 (7th Cir. 1991). To satisfy the requirement of Rule 9(b), a plaintiff pleading fraud must state "the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (citation and internal quotation marks omitted). Stated differently, to plead fraud with particularity, a plaintiff must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *United States ex rel. Garst v. Lockheed–Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003) (citation omitted); *see Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) ("Heightened pleading in the fraud context is required in part because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled.").

**ANALYSIS**

**A.     Allegations of Fraudulent Conduct**

The Defendants' motions seek to dismiss the FCA and Indiana FCA claims, as well as the

other claims against them, for failing to plead fraud with particularity. Because the Plaintiffs'

claims are based on the Defendants' allegedly fraudulent conduct, they must meet the heightened

particularity standard of Rule 9(b). "The FCA is an anti-fraud statute and claims under it are

subject to the heightened pleading requirements of Rule 9(b)."[2] *United States ex rel. Gross v.*

*Aids Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005). Similarly, claims under

Indiana's deception statute, Ind. Code § 34-24-3-1, "are subject to the particularity requirements

of Rule 9(b)" because such claims "are, on their face, anti-fraud statutes." *ABN Amro Mortg.*

*Grp., Inc. v. Maximum Mortg. Inc.*, 429 F. Supp. 2d 1031, 1042 (N.D. Ind. 2006). As "it is

allegations of fraud, not claims of fraud, to which Rule 9(b) applies," the Plaintiffs' other claims,

including conspiracy, unjust enrichment and payment by mistake, are also subject to the Rule 9

pleading standard. *Pirelli*, 631 F.3d at 447(dismissing an unjust enrichment claim that "was

hitched to [a] fraud claim"); *see United States ex. rel. Morison v. Res-Care, Inc.*, No.

415CV00094RLYDML, 2017 WL 468287, at *4 (S.D. Ind. Feb. 3, 2017) ("[A]n alleged

conspiracy to defraud is held to Rule 9(b)'s heightened pleading standards."); *United States ex*

*rel. McCoy v. Madison Ctr.*, No. 3:10-CV-259 RM, 2011 WL 1791710, at *9 (N.D. Ind. May 9,

2011) ("[T]he State must plead fraud (the basis of each of its claims, including the breach of

contract and unjust enrichment claims . . .) with particularity.").

---

[2]  The Court's discussion of the FCA claims applies with equal force to the Indiana FCA claims
"[b]ecause the Indiana FCA 'mirrors the Federal FCA in all material respects.'" *United States v.*
*Indianapolis Neurosurgical Grp., Inc.*, No. 1:06-CV-1778-JMS-DML, 2013 WL 652538, at *7 n.9 (S.D.
Ind. Feb. 21, 2013) (quoting *Kuhn v. LaPorte Cty. Comprehensive Mental Health Council*, No. 3:06-CV-
317 CAN, 2008 WL 4099883, at *3 n.1 (N.D. Ind. Sept. 4, 2008)).

1.      *Allegations of Notice*

The Defendants argue that the Complaint does not allege that they received notice of the change in Indiana Medicaid's coverage and payment rules effective January 1, 2011. The Complaint states that "[d]uring December 2010, all enrolled Indiana Medicaid providers, including defendants, received IHCP bulletin BT201062 announcing a new CPT Code 80104," and that 2011 CPT code book, which became available before 2011, explained "[f]or qualitative analysis by multiplexed screening kit for multiple drugs or drug classes [the type of screening kits allegedly used by the Defendants], use 80104." (Compl., ¶ 51.) The Complaint states that Don Wagoner and WMC received an explanation of the 91 modifier billing rules in an IHCP bulletin in March 2009, as well as reminders of the 91 modifier billing rules in IHCP bulletins in February and June 2011. (*Id*., ¶ 50.) In addition, the Complaint alleges that in January 2011, WMC's billing manager spoke with Indiana Medicaid and told Don Wagoner that Indiana Medicaid had denied certain urine drug screen claims based on new billing rules requiring providers to bill a urine drug screen test for the same patient on the same day only once. (*Id*., ¶¶ 57-58.) The Court finds that these allegations sufficiently state that Don Wagoner and WMC received notice and had knowledge of the coverage and payment rules applicable to the Indiana Medicaid claims at issue.

2.      *Allegations of False Claims*

The Defendants assert that the Complaint's allegations of false claims are conclusory statements without factual support. They maintain that the Complaint does not explain: why billing for CPT Code 80101 was incorrect; why they should have been billing for CPT Code

80104; or why the representative claims were false. According to the Defendants, the Complaint concludes that because the Defendants never possessed or used chromatography equipment for quantitative drug tests (Compl., ¶ 44), their Medicaid claims should have been submitted as qualitative drug tests using a non-chromatographic method under CPT Code 80104. The Defendant argue this conclusion is improper because it assumes that "the Defendants would not have used qualitative urine drug screen kits that utilize a chromatographic method and would fit within the confines of CPT code 80101." (Defs' Br. at 11.) They note that the Complaint fails to plead whether the Defendants' qualitative urine drug screen kits utilized a chromatographic test, or plead any representative claim that was identified as not providing a qualitative, chromatographic drug screen.

The Court finds the Defendants' arguments to be unavailing. To establish an FCA claim, a plaintiff must show that "(1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false." *Gross*, 415 F.3d at 604 (citations omitted); *see* 31 U.S.C. § 3729(a)(1). The Complaint alleges that the claims submitted to Indiana Medicare were false in part because they were submitted under CPT Code 80101 instead of CPT Code 80104. (*See* Compl., ¶¶ 54-55); *see United States ex rel Turner v. Michaelis Jackson & Assocs.*, No. 03-CV-4219-JPG, 2007 WL 496384, at *7 (S.D. Ill. Feb. 13, 2007) ("relators have shown why the bill submitted to Medicare was false: it was billed pursuant to CPT 99213 rather than CPT 66984"). While the Defendants maintain that they "in fact, used qualitative, chromatographic urine drug screen tests" (Defs. Br. at 7 n.8), and thus, using CPT Code 80101 was appropriate, the motion to dismiss stage is not the proper juncture to resolve disputed facts.

Setting aside the CPT Codes, the Complaint adequately alleges a fraudulent scheme to induce Indiana Medicaid to pay the Defendants nine or more times for each drug test using a single urine sample.[3] It alleges that the Defendants devised a scheme to routinely submit nine or more claims to Indiana Medicaid using a 91 modifier when they tested a single sample from a single patient visit using a multiplex screening kit, thereby falsely certifying that each of the patients had come to the office nine or more times and provided nine or more urine samples that were separately analyzed. (Compl., ¶ 59.) These allegations are supported by multiple exhibits listing the procedure code, modifier, quantity of claims, and amount paid for thousands of claim numbers. (*Id.*, ¶ 63, Exs. 1B, 1C, 1D, 1E.) The Complaint allegations and exhibits put the Defendants on notice of the nature of the alleged scheme and point them to many specific examples of this conduct. While the Defendants argue that WMC "was correct in billing CPT code 80101 for 9 units" because it "performed a qualitative, chromatographic urine drug screen that screened for 9 different classes" (Defs. Br. at 13), that is an issue of fact that is not to be resolved at the motion to dismiss stage.

---

[3] The Complaint alleges that:

> If defendants had billed Indiana Medicaid for [the allegedly incorrect] CPT Code 80101 . . . only once each time they tested a single urine sample for a single visit by the same patient on the same day using a multiplexed screening kit, defendants would have received an overpayment of only a few thousand dollars or less. Defendants' knowing false statements when, for thousands of tests, defendants routinely used the 91 modifier to submit 9 or more claims for a single urine drug screening test using a multiplexed screening kit caused an egregious overpayment to defendants from Indiana Medicaid of approximately $1,121,277.76.

(Compl., ¶ 52.)

*3.     Allegations of the Plaintiffs' Damages*

The Defendants assert that the Complaint fails to allege representative claims that resulted in overpayment. They argue the merits of the FCA claims, maintaining that no damages are alleged because the representative claims identified in the Complaint were proper. When deciding a Rule 12(b)(6) motion, all well-pleaded facts must be accepted as true, and all reasonable inferences from those facts must be resolved in the plaintiff's favor. The Complaint repeatedly asserts that the Defendants' knowing false and fraudulent claims caused the overpayment of over $1.1 million, which was the property of the State of Indiana and the United States. (Compl., ¶¶ 52, 63, 79, 114, 138.) Therefore, the Complaint sufficiently alleges damages.

*4.     Allegations of the Defendants' Knowledge*

The Defendants contend that the Complaint fails to plead sufficient facts to show knowledge for purposes of the FCA claims. Knowledge may be alleged generally. Fed. R. Civ. P. 9(b). The FCA does not require specific intent to defraud, and states that the defendant must "have acted with 'actual knowledge,' or with 'deliberate ignorance' or 'reckless disregard' to the possibility that the submitted claim was false." *United States ex rel. Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning Investments, LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (quoting 31 U.S.C. § 3729(b)(1)(A), (B)). "Innocent mistakes or negligence are not actionable." *Id.* (citation omitted). The Defendants contend that the violations alleged in the Complaint are nothing more than technical regulatory violations that would not render an overpayment to them actionable under the FCA. "[M]inor technical regulatory violations do not make a claim 'false' for purposes of the FCA; the existence of mere technical regulatory violations tends to undercut any notion that a prior representation of regulatory compliance was knowingly and falsely made

in order to deceive the government." *Gross*, 415 F.3d at 604 (citation omitted); *see United States ex rel. Grenadyor v. Ukrainian Vill. Pharm.*, *Inc.*, 772 F.3d 1102, 1107 (7th Cir. 2014) ("[I]t is not enough to allege, or even prove, that the pharmacy engaged in a practice that violated a federal regulation. Violating a regulation is not synonymous with filing a false claim.").

The Complaint does not rely on mere technical regulatory violations. Rather, it alleges that after the Defendants learned of Indiana Medicaid's reason for denying their claims in January 2011, they devised a scheme to be paid nine or more times every time WMC tested a single urine sample from a single patient visit using a multiplexed screening kit. (Compl., ¶¶ 58, 59.) At Don Wagoner's direction, WMC's office manager allegedly programmed WMC's billing department computer to populate nine claims with CPT Code 80101 and a 91 modifier automatically after each claim each time a billing department employee typed in CPT 80101 once. (*Id.*, ¶ 59.) Thereafter, at Don Wagoner's direction, WMC's billing staff billed CPT Code 80101 with a 91 modifier at least nine times every time WMC tested a single urine sample from a single patient visit using a multiplexed screening kit. (*Id.*) The Complaint also alleges that WMC's policy regarding billing urine drug screen tests was discussed at WMC billing staff meetings, and at least one WMC physician and physician's assistant meeting. (*Id.*, ¶¶ 60, 61.) It further alleges that WMC's billing manager recommended to Don Wagoner that the Defendants repay Indiana Medicaid for these claims, but Don Wagoner refused and told her that the Defendants would not issue any refunds to Indiana Medicaid. (*Id.*, ¶ 62.) Accepting these well-pleaded facts as true, and resolving all reasonable inferences from those facts in Plaintiffs' favor, the Court finds that the Complaint adequately alleges Don Wagoner's and WMC's knowledge of the false claims. *See Turner*, 2007 WL 496384, at *7 (denying motion to dismiss FCA claim based on manipulation of Medicare's billing system, noting a defendant's "manipulation alone

would not be sufficient to state claim, but when that manipulation is coupled with a false statement, the situation is meaningfully different").

5.      *Allegations of Fraud against Marilyn*, *Wagoner PC, and Wagoner & Wagoner*

Defendants Marilyn, Wagoner PC, and Wagoner & Wagoner argue that the Complaint fails to plead fraud with particularity against them because it does not allege the who, what, why, where and how of the fraud. This argument has merit. In a case involving multiple defendants, fair notice is the "most basic consideration underlying Rule 9(b)." *Vicom*, 20 F.3d at 777–78 (citation omitted). Thus, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id.* at 778 (citations and internal quotation marks omitted); *see Balabanos v. N. Am. Inv. Grp., Ltd.*, 708 F. Supp. 1488, 1493 (N.D. Ill. 1988) ("Where there are allegations of a fraudulent scheme with more than one defendant, the complaint should inform each defendant of the specific fraudulent acts that constitute the basis of the action against the particular defendant."). "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'" *Vicom*, 20 F.3d. at 778.

Courts have granted motions to dismiss FCA claims where a complaint fails to differentiate among the defendants and plead each defendant's role in the fraud. *See United States ex rel. Young v. Suburban Home Physicians*, *Medicare & Medicaid P 305,998*, No. 14-cv-02793, 2017 WL 2080350 (N.D. Ill. May 15, 2017) (dismissing FCA claims that lumped together individual defendants and did not specify who was involved in which activity); *United States ex rel. Radke v. Sinha Clinic Corp.*, *Medicare & Medicaid P 305375*, No. 12 cv 6238, 2015 WL 4656693 at *3 (N.D. Ill. Aug. 5, 2015) (dismissing FCA claim for insufficient detail regarding how each defendant was engaged in the fraud); *United States ex rel. Dolan v. Long*

*Grove Manor, Inc.*, *Medicare & Medicaid P 305010*, No. 10 C 368, 2014 WL 3583980, at *4--
*5 (N.D. Ill. July 18, 2014) (dismissing FCA claims for failure to differentiate between conduct
of different defendants); *United States ex rel Walner v. NorthShore Univ. Healthsystem*, 660 F.
Supp. 2d 891, 897 (N. D. Ill. 2009) (dismissing qui tam action where relator "fail[ed] to
differentiate among Northshore and the other individuals mentioned and fail[ed] to plead each
Defendant[']s role in the fraud"); *Suburban Buick*, *Inc. v. Gargo*, No. 08 C 0370, 2009 WL
1543709 at *4 (N.D. Ill. May 29, 2009) ("The complaint should not lump multiple defendants
together, but should inform each defendant of the specific fraudulent acts that constitute the basis
of the action against the particular defendant.") (internal quotations and citations omitted).

The Complaint alleges that Don Wagoner and WMC executed and were obligated to
comply with IHCP Provider Agreements, and that WMC was an enrolled Medicaid provider.
(Compl., ¶¶ 37, 38.) The exhibits attached to the Complaint reference only "Wagoner Medical
Center" claims paid by Indiana Medicaid for services rendered. (*See id*., Exs. 1-A, 1-B, 1-C, 1-D,
1-E.) While the Complaint alleges misconduct by the "defendants," it does not allege facts
indicating that Marilyn, Wagoner PC, or Wagoner & Wagoner presented a false statement, or
caused a false statement to be presented, in order to receive money from the government.[4] *See*

---

[4] Aside from the Complaint's caption, the only specific references to Wagoner & Wagoner are that the
entity was organized as an Indiana Medical Professional Corporation by Marilyn and Don Wagoner, that
its shareholders, officers and agents rendered medical services through it, and that Marilyn and Don
Wagoner are co-owners of it. (Compl., ¶¶ 7, 8, 11.) The only references to Wagoner PC allege that the
entity was owned and organized as a medical facility by Don Wagoner, that Marilyn was an executive of
it, and that Marilyn and Don Wagoner practiced medicine through it. (*Id*., ¶¶ 7, 8, 10.) As for references
to Marilyn, the Complaint alleges that she is Don Wagoner's spouse, co-owner of Wagoner & Wagoner,
an executive of Wagoner PC, and practiced medicine through the Entity Defendants. (*Id*., ¶ 8.) It alleges
that "WMC's billing department employees typed in Indiana Medicaid claims based on the notations on a
superbill provided to them by physicians and physician's assistants, including defendant Marilyn L.
Wagoner, at defendant WMC." (*Id*., ¶ 59.) It also alleges that Marilyn and Don Wagoner "routinely
attended" periodic meetings of physicians and physician's assistants at MWC during which "the subject
of revenue generated from insurance billings, including Indiana Medicaid, for urine drug screen tests was

*Jimerson v. Harris*, No. 2:15 CV 178, 2018 WL 339230, at \*2 (N.D. Ind. Jan. 5, 2018) (granting

motion to dismiss defendant where the sole allegation that defendant was responsible for issuing

the settlement payments failed to allege any wrongdoing on the part of defendant). Nor does the

Complaint allege facts that the scheme was controlled or directed by Marilyn, Wagoner PC, or

Wagoner & Wagoner. *See United States ex rel. Lisitza v. Par Pharm. Cos.*, *Inc.*, *Medicare &*

*Medicaid P 304368*, No. 06 C 06131, 2013 WL 870623, at \*5 (N.D. Ill. Mar. 7, 2013)

(dismissing FCA claims where they failed to include allegations about involvement of particular

defendant companies).

The Plaintiffs argue that the Complaint asserts allegations against Marilyn, Wagoner PC,

and Wagoner & Wagoner in over sixty numbered paragraphs by either naming them specifically

or including them with the other defendants. They contend that the Complaint refers collectively

to the "defendants" to avoid a cumbersome and wordy complaint. Citing no case law or

complaint allegations, the Plaintiffs insist that individual defendants Marilyn and Don Wagoner

"engaged in a shell game in which they formed [the Entity Defendants] under which they

provided services to patients." (Pls. Resp. at 14.) They maintain that because Marilyn and Don

Wagoner "created ambiguity regarding which entity was providing their physician services to

Indiana Medicaid patients or ultimately receiving payments from Indiana Medicaid," fairness

requires the Entity Defendants to respond to the alleged Medicaid fraud. (*Id*.) These inferences

are not reasonable without some factual basis in the Complaint suggesting a "shell game," or

other involvement in the alleged scheme by Marilyn, Wagoner PC, or Wagoner & Wagoner. *See*

*Lisitza*, 2013 WL 870623 at \*5. The Complaint provides none, and "a plaintiff may not amend

---

a topic of conversation at least once." (*Id*., ¶ 61.) These allegations do not plead fraudulent conduct by
these Defendants with particularity.

his complaint in his response brief." *Pirelli*, 631 F.3d at 448. Therefore, the claims against

Marilyn, Wagoner PC, and Wagoner & Wagoner are dismissed without prejudice.


**B.      Intracorporate Conspiracy Doctrine**

The Defendants move to dismiss the claims that they conspired to violate the FCA and

Indiana FCA based on the intracorporate conspiracy doctrine. "[G]eneral civil conspiracy

principles apply" to FCA conspiracy claims. *United States ex rel. Durcholz v. FKW Inc.*, 189

F.3d 542 (7th Cir. 1999) (citation omitted). To plead an FCA conspiracy claim, a plaintiff must

allege "that the defendants had an agreement, combination, or conspiracy to defraud the

government by getting a false or fraudulent claim allowed or paid and that they did so for the

purpose of obtaining or aiding to obtain payment from the government or approval of a claim

against the government." *Lisitza*, 2013 WL 870623, at *7 (citation omitted). The Complaint

alleges that the Defendants planned among themselves, and with other WMC employees, to

devise a scheme to falsely overbill Indiana Medicaid for multiple urine drug screen claims, when

in fact only one urine drug test was performed using a multiplexed screening kit for each patient.

(Compl., ¶¶ 86, 121.) Venues for the conspiracy allegedly included monthly billing department

meetings, periodic meetings of physicians and physician assistants, informal conversations

between the Defendants and WMC's office manager, and informal conversations between the

Defendants and WMC's billing department manager. (*Id.*)

The Defendants argue that the Court should dismiss the conspiracy claims based on the

intracorporate conspiracy doctrine. *See United States ex rel. Chilcott v. KBR, Inc.*, No. 09–CV–

4018, 2013 WL 5781660, at *10–12 (C.D. Ill. Oct. 25, 2013) (holding the intracorporate

conspiracy doctrine barred FCA conspiracy claims where all alleged conspirators were actors

within the same corporate entity); *United States ex rel. McGinnis v. OSF Healthcare Sys.*, No. 11-CV-1392, 2014 WL 2960344, at *10 (C.D. Ill. July 1, 2014) (same). Under the intracorporate conspiracy doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). Because Don Wagoner owned and practiced medicine through the Entity Defendants, and Marilyn was co-owner of Wagoner & Wagoner, an executive of Wagoner PC, and practiced medicine though the Entity Defendants (Compl., ¶¶ 7, 8), Marilyn and Don Wagoner could not conspire with the Entity Defendants. *See Elder Care Providers of Ind.*, *Inc. v. Home Instead*, *Inc.*, No. 114CV01894SEBMJD, 2015 WL 13632962, at *4 (S.D. Ind. Dec. 10, 2015) (granting motion to dismiss conspiracy claim against companies' owners and officers because they could not conspire with those companies).[5] Therefore, the Complaint fails to state conspiracy claims upon which relief can be granted against Marilyn and Don Wagoner.

The Plaintiffs contend that the intracorporate conspiracy doctrine does not apply to the Entity Defendants because they do not have interlocking ownership with each other. They assert that Marilyn and Don Wagoner "purposely have created ambiguities regarding which entities provided services to Indiana Medicaid patients and which entities ultimately received payments from Indiana Medicaid for defendants' fraudulent claims" (Pls. Br. at 13), but cite no Complaint allegations to support this assertion. They rely on *America's Best Cinema Corporation v. Fort Wayne Newspapers*, *Inc.*, for the proposition that "affiliated or integrated ownership does not

---

[5] The Complaint also alleges that WMC's office manager, Michelle Wagoner, assisted the Defendants in perpetrating their fraud. (Compl., ¶¶ 59, 86, 121.) In their response brief, the Plaintiffs claim that Michelle Wagoner was not employed by any defendant, but rather, was an employee of "The Burlington Medical Center, Inc." (Pls. Resp. at 13-14.) Given the lack of Complaint allegations or evidence to support this assertion, and the allegations identifying Michelle Wagoner as WMC's office manager, it would be unreasonable for the Court to infer that she was not an agent of WMC.

preclude the existence of a combination or conspiracy among related corporations." 347 F. Supp. 328, 331 (N.D. Ind. 1972). "The fact of common ownership and direction cannot save them from any of the obligations that the law imposes on those separate entities." *Id*. at 332.

The Court cannot determine whether the intracorporate conspiracy doctrine applies to the Entity Defendants because the Plaintiffs have failed to plead their conspiracy claims with the requisite specificity under Rule 9(b). Setting aside the allegations of wrongdoing by WMC, the Complaint does not distinguish between the Entity Defendants and differentiate them in the conspiracy counts. *See Frontline Commc'ns*, *Inc. v. Comcast Corp*., No. 12-CV-8527, 2013 WL 4777370, at \*4 (N.D. Ill. Sept. 5, 2013) (dismissing civil conspiracy claim without prejudice where the Complaint referred to the two defendants collectively and did not differentiate them); *see also Home Instead*, 2015 WL 13632962, at \*5 (noting "[i]t may well be that [two companies] cannot conspire with each other where the [owners] acted on behalf of both companies in the alleged conspiracy," but declining to resolve the issue because the parties did not fully address it). The conspiracy claim lumps the Defendants together, only mentioning with specificity WMC's office manager and billing department manager, one of whom the Plaintiffs now assert was not an employee of WMC. (*See* Pls. Resp. at 13-14.) As it currently stands, the Complaint does not state conspiracy claims for which relief may be granted. Therefore, the conspiracy claims are dismissed without prejudice.

To the extent the Plaintiffs are able to cure any of the deficiencies identified above, including the conspiracy claims and the claims against Marilyn, Wagoner PC and Wagoner & Wagoner, the dismissal is without prejudice and with leave to file an amended complaint. *See Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008) ("District courts routinely do not terminate a case at the same time that they grant a defendant's motion to dismiss; rather, they generally

dismiss the plaintiff's complaint without prejudice and give the plaintiff at least one opportunity to amend her complaint."); *see also Carmody v. Bd. of Trustees of Univ. of Ill.*, 747 F.3d 470, 480 (7th Cir. 2014) ("In general, a district court should freely give leave to amend to cure curable defects, at least where there is no undue delay or undue prejudice to the opposing party.").

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART the Defendants' Motion to Dismiss [ECF No. 9], and GRANTS Defendants Marilyn L. Wagoner, Wagoner Medical Center, P.C., Don J. Wagoner, M.D. and Marilyn L. Wagoner, M.D., P.C.'s Motion to Dismiss [ECF No. 11].

SO ORDERED on September 20, 2018.

 s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT